# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 21-SW-147 |
| APPLE BLACK IPHONE 11 (IMEI: 356543101844685); APPLE BLACK IPHONE 11 (IMEI: 356115091860888) | ) ) | |
| CURRENTLY LOCATED AT THE FBI, WASHINGTON FIELD OFFICE, WASHINGTON, D.C. UNDER RULE 41 | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 372 ; 111 (a) and (b); 2 ; 231; 1512(c)(2); 1752(a) and (b); 40 U.S.C. § 5104(e)(2)(F) | "Conspiracy to injure an officer"; "Assaulting an Officer of the United States with a deadly or dangerous weapon"; "Aiding and Abetting"; "Civil Disorder"; "Obstruction of an Official Proceeding"; "Physical violence on restricted grounds, while carrying dangerous weapon, and resulting in significant bodily injury"; "Violent Entry, Disorderly Conduct and act of physical violence on Capitol Grounds" |

The application is based on these facts:

see attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Riley Palmertree, Special Agent- FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 05/19/2021 _____

_____
*Judge's signature*

City and state: _____ Washington, DC _____      Robin M. Meriweather, Magistrate Judge, US District Court
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or<br>identify the person by name and address)*<br><br>APPLE BLACK IPHONE 11 (IMEI: 356543101844685); APPLE BLACK<br>IPHONE 11 (IMEI: 356115091860888)<br><br>CURRENTLY LOCATED AT THE FBI, WASHINGTON FIELD OFFICE,<br>WASHINGTON, D.C.<br>UNDER RULE 41 | )<br>)<br>)<br>)<br>)<br>)<br>)          Case No.  21-SW-147 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:          Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____Columbia_____
*(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

**YOU ARE COMMANDED** to execute this warrant on or before _____June 1, 2021_____ *(not to exceed 14 days)*
   ☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Robin M. Meriweather_____ .
*(United States Magistrate Judge)*

   ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
   ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   ___05/19/2021_____

City and state:   _Washington, DC_____          _____
                                                                                                          *Judge's signature*

                                                                                       Robin M. Meriweather, Magistrate Judge
                                                                                                  *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 21-SW-147 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

 

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

*Property to be searched* is an:

### KHATER's Cellular Telephone

Apple Black iPhone 11 (IMEI: 356543101844685). The Device is currently located at the FBI Washington Field Office, Washington, D.C., ("KHATER DEVICE").

### TANIOS' Cellular Telephone

Apple Black iPhone 11 (IMEI: 356115091860888). The Device is currently located at the FBI Washington Field Office, Washington, D.C., ("TANIOS DEVICE").

## ATTACHMENT B

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 372 (Conspiracy to injure an officer), 18 U.S.C. §§ 111 (a) and (b) (Assaulting an Officer of the United States with a deadly or dangerous weapon); 18 U.S.C. § 2 (Aiding and Abetting), 18 U.S.C. § 231 (Civil Disorder); 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding); 18 U.S.C. § 1752(a) and (b) (Physical violence on restricted grounds, while carrying dangerous weapon, and resulting in significant bodily injury); 40 U.S.C. § 5104(e)(2)(F) (Violent Entry, Disorderly Conduct and act of physical violence on Capitol Grounds)  (the "Target Offenses"), as described in the search warrant affidavit, including, but not limited to:

   a.  Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

   b.  Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

   c.  Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

   d.  Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

1

e.   Evidence relating to a conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

f.   Evidence concerning the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

g.   Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

h.   Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

i.   Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

j.   Evidence of any conspiracy, planning, or preparation to commit those offenses;

k.   Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

l.   Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law-enforcement, such as pepper spray or smoke grenades;

m.   Evidence of communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

n.   Any evidence revealing the SUBJECT's presence at the January 6, 2021, riot;

o.   Electronic receipts for travel, which may serve to prove evidence of travel of to or from Washington D.C. from December of 2020 through January of 2021;

p.   The SUBJECTS's (and others') motive and intent for traveling to the U.S. Capitol on or about January 6, 2021; and

q.   The SUBJECTS's (and others') activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021.

2

r.  Evidence of the state of mind of the subject and/or other co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

s.  Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

t.  Records and information relating to the identity or location of perpetrators, aiders and abettors, coconspirators, and accessories before and after the fact;

u.  Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with KHATER and/or TANIOS about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

v.  evidence of who used, owned, or controlled the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

w.  evidence of software, or the lack thereof, that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

x.  evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

y.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

z.  evidence of the times the Devices was used;

3

aa. passwords, encryption keys, and other access devices that may be necessary to access the Devices;

bb. documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

cc. records of or information about Internet Protocol addresses used by the Devices; and

dd. records of or information about the Devices' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF** | |
| **APPLE BLACK IPHONE 11**<br>**(IMEI: 356543101844685)** | |
| **APPLE BLACK IPHONE 11**<br>**(IMEI: 356115091860888)** | **SW No.  21-SW-147** |
| **CURRENTLY LOCATED AT THE FBI**<br>**WASHINGTON FIELD OFFICE,**<br>**WASHINGTON, D.C.**<br>**UNDER RULE 41** | |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Riley Palmertree, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — specifically, the KHATER and TANIOS digital devices as described in Attachment A — which are currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been in this position since May 2017. I am currently assigned to the FBI Washington Field Office ("WFO") in Washington, D.C. I am currently assigned to the Violent Crimes Task Force Squad CR-2, which focuses on the Washington, D.C. metropolitan area. I have investigated violent crimes since approximately October of 2017. As part of my duties, I have investigated homicides,

5

bank robberies, carjackings, kidnappings, fugitive cases, and other crimes of violence. During these investigations, I have employed a variety of investigative techniques including preparing and executing search and arrest warrants that have led to seizures of contraband.

3.      I am one of the investigators assigned to an ongoing investigation by the FBI, United States Capitol Police ("USCP"), Metropolitan Police Department ("MPD"), and other law enforcement agencies, of riots and civil disorder that occurred on January 6, 2021, in and around the United States Capitol grounds. Since I became involved in this investigation on January 6, 2021, I have conducted interviews, reviewed public tips, reviewed publicly available photos and video, and reviewed relevant documents, among other things.

4.      As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 372 (Conspiracy to injure an officer), 18 U.S.C. §§ 111 (a) and (b) (Assaulting an Officer of the United States with a deadly or dangerous weapon); 18 U.S.C. § 2 (Aiding and Abetting), 18 U.S.C. § 231 (Civil Disorder); 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding); 18 U.S.C. § 1752(a) and (b) (Physical violence on restricted grounds, while carrying dangerous weapon, and

resulting in significant bodily injury); 40 U.S.C. § 5104(e)(2)(F) (Violent Entry, Disorderly Conduct and act of physical violence on Capitol Grounds) (the "Target Offenses") have been committed by Julian Elie KHATER and George Pierre TANIOS. There is also probable cause to search the KHATER and TANIOS Devices, further described below and in Attachment A, for the things described in Attachment B.

### IDENTIFICATION OF THE KHATER AND TANIOS DEVICES TO BE EXAMINED

The property to be searched is:

**KHATER DEVICE**

Apple Black iPhone 11 (IMEI: 356543101844685). The Device is currently located at the FBI Washington Field Office, Washington, D.C., ("KHATER DEVICE").

**TANIOS DEVICE**

Apple Black iPhone 11 (IMEI: 356115091860888). The Device is currently located at the FBI Washington Field Office, Washington, D.C., ("TANIOS DEVICE").

### PROBABLE CAUSE

*Background – The U.S. Capitol on January 6, 2021*

7.      USCP, the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

8.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the west side of the

7

Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor. On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and off limits to the public on January 6, 2021.

9.     The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

10.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

11.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST). Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

12.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the

exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

13.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

14.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

15.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

16.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

17.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



18.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber. As the subjects attempted to break into

the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

19.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

20.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

21.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

22.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



23.    After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



24.     An unknown subject left a note on the podium on the floor of the Senate Chamber.

This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



25.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the US Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs. Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





26.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

27.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

28.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

29.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

30.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons

check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

31.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

32.     Beginning around 9:00 p.m., the House resumed work on the Certification.

33.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

34.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

35.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

36.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of

themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

37.    Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot. In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



[1] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/





---

[2] https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.

[3] https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

## **FACTS SPECIFIC TO THIS APPLICATION**

38.     At approximately 1:00 p.m., a crowd of violent rioters had assembled on the Lower West Terrace. U. S. Capitol Police had formed a line of bike racks extending from the North end of the Lower West Terrace to the South end, to act as a barrier against the crowd. Officers were standing watch behind this line and fending off repeated attempts by the rioters to pull on the bike racks, either with their hands or with ropes and straps.

39.     In reviewing surveillance footage of this incident, your affiant observed JULIAN ELIE KHATER and GEORGE PIERRE TANIOS, collectively, the "SUBJECTS," working together to assault law enforcement officers with an unknown chemical substance by spraying officers directly in the face and eyes. Your affiant further observed these SUBJECTS appeared to time the deployment of chemical substances to coincide with other rioters' efforts to forcibly remove the bike rack barriers that were preventing the rioters from moving closer to the Capitol building.

40.     Surveillance footage shows that at 2:09 p.m., TANIOS can be seen walking from the south grassy area toward the Lower West Terrace. KHATER can be seen walking behind TANIOS. KHATER is wearing a beanie with a pom-pom on top, a dark jacket, and has a beard. TANIOS is wearing a red hat, black backpack, dark hooded sweatshirt, and has a beard. On this surveillance footage, TANIOS can be seen holding up a digital device and appearing to film the unfolding violence on the West Terrace involving rioters clashing with law enforcement officers. At 2:14 p.m., TANIOS and KHATER can be seen engaging each other in animated conversation while they are standing together.

41.     During the investigation, law enforcement discovered open source media video of

the incident from January 6, 2021. On the video, KHATER is seen making his way towards TANIOS. KHATER then states, "Give me that bear shit," and reaches into the backpack on TANIOS' back. TANIOS then states, "Hold on, hold on, not yet, not yet… its still early." KHATER is then seen emphatically telling TANIOS, "They just fucking sprayed me," and KHATER is seen holding a white can with a black top that appears to be a can of chemical spray. See Figure One, below.



*Figure One*

42.     This verbal exchange between KHATER and TANIOS, together with KHATER's retrieval of the spray can from TANIOS, reveals that the two were working in concert and had a plan to use the toxic spray against law enforcement.

43.     On the video, KHATER continues to talk animatedly with TANIOS. At approximately 2:20 p.m., KHATER walks through the crowd to within a few steps of the bike rack

barrier. KHATER is standing directly across from a line of law enforcement officers to include U.S. Capitol Police ("USCP") Officers B. Sicknick and C. Edwards, and Metropolitan Police Department ("MPD") Officer D. Chapman, who was equipped with a functioning body worn camera ("BWC") device.

44.     Officer Chapman's BWC shows that at 2:23 p.m., the rioters begin pulling on a bike rack to Chapman's left, using ropes and their hands to pull the rack away. Seconds later, KHATER is observed with his right arm up high in the air, appearing to be holding a canister in his right hand and aiming it in the officers' direction while moving his right arm from side to side. Officer Chapman's BWC confirms that KHATER was standing only five to eight feet away from the officers. *See* Figure Two, below.



*Figure Two*

45.     In reviewing the surveillance footage and BWC video, your affiant observes that Officers Sicknick, Edwards and Chapman, who are standing within a few feet of KHATER, all

react, one by one, to something striking them in the face. The officers immediately retreat from the line, bring their hands to their faces and rush to find water to wash out their eyes, as described in further detail below and as captured in the following screen shots. *See* Figures Three and Four, below.



*Figure Three*



*Figure Four*

46.     At 2:23 p.m., on the surveillance footage, KHATER is again observed raising his

arm and continues to spray in the direction of law enforcement officers. MPD Lt. Bagshaw notices

these actions and approaches KHATER. At 2:23 p.m., Lt. Bagshaw then sprays KHATER, as

observed on both surveillance footage and Lt. Bagshaw's BWC. *See* Figure Five, below.



*Figure Five*

47.     After being sprayed by Lt. Bagshaw, KHATER disappears from view of the surveillance cameras, as has Tanios. Khater reappears at approximately 2:42 p.m. at the same location on the Lower West Terrace, after the police line has been breached and rioters have advanced to the Upper Terrace. He is seen holding his phone to his ear and appears to be speaking. See Figure Six, below.



*Figure 6*

48.     Through investigative efforts, including searches of law enforcement databases, social media queries, and grand jury subpoenas, your affiant has obtained information demonstrating that (732)439-1927 (TARGET PHONE NUMBER) is associated with KHATER and has been associated with KHATER for some time. Subscriber records obtained from Verizon Communications show that the TARGET PHONE NUMBER is registered to a device with IMEI:

356543101844685 and to an individual named Elie Khater, with a listed address of 36 Hadler Drive in Somerset, NJ. The government's investigation has revealed that Elie Khater is KHATER's father (KHATER's middle name is identical to his father's first name), and that KHATER used his family's address in New Jersey in the past. Additionally, records received pursuant to a grand jury subpoena demonstrate that KHATER utilized the TARGET PHONE NUMBER to register his personal Facebook Account, with username jk10452, on May 26, 2009, and to register his WhatsApp messaging application account on May 21, 2015. Moreover, the profile photograph of the WhatsApp account appears to be that of KHATER. The WhatsApp account linked to the TARGET PHONE NUMBER was last active on March 11, 2021 at 8:33 p.m. Law enforcement database searches and credit records also have the TARGET PHONE NUMBER associated with KHATER in 2019 and 2020. Records also show that on January 6, 2021, at 2:42 p.m., KHATER's phone was on a 21 second call with the number (304)777-3321. Subscriber records obtained pursuant to a grand jury subpoena from AT&T show (304)777-3321 is registered to George Pierre Tanios, with a listed address of 205 Blue Ridge Lane, Morgantown, WV 26508. According to these records, this phone number is registered to a device with IMEI: 356115091860888.

49.     On March 19, 2021, law enforcement spoke with W-3, who stated that one or two days prior to January 6, 2021, TANIOS walked into a store in Morgantown, West Virginia, and stated that he was going to the rally in Washington, D.C. He asked W-3 if Tanios could take a firearm TANIOS owned to D.C., and W-3 responded no. TANIOS then inquired about a pepper ball gun, and was again told by W-3 that he could not take a pepper ball gun to D.C. because it shot projectiles. TANIOS then inquired about carrying mace in D.C., and W-3 stated that it was

allowed as long as it was aerosol based. TANIOS purchased two cannisters of Frontiersman brand bear spray, and two additional pepper spray cannisters. Law enforcement also obtained copies of the receipts for this purchase, which showed the chemical sprays were purchased on January 5, 2021, at 5:09 p.m. Furthermore, W-3 stated that TANIOS was on the phone when he entered the store, and TANIOS told W-3 that Tanios was speaking to the friend who was accompanying him to D.C. for the rally. Phone records obtained pursuant to subpoena show that at 4:58 p.m. on January 5, 2021, eleven minutes before the purchase, KHATER's known cell phone number connected with TANIOS' known cell phone number for a 39 second call.

### Injuries to Officers

50.     Officers Sicknick, Edwards, and Chapman suffered injuries as a result of being sprayed in the face with an unknown substance by KHATER. The officers were temporary blinded by the substance, were temporary disabled from performing their duties and needed medical attention and assistance from fellow officers. They were initially treated with water in an effort to wash out the unknown substance from their eyes and on their face. All three officers were incapacitated and unable to perform their duties for at least 20 minutes or longer while they recovered from the spray. Officer Edwards reported lasting injuries underneath her eyes, including scabbing that remained on her face for weeks. Officers Edwards and Chapman also described the spray to their face as a substance as strong as, if not stronger than, any version of pepper spray they had been exposed to during their training as law enforcement officers. Officer Sicknick reported to his supervisors and colleagues that he had been sprayed in the face with a substance.

## ARREST OF THE DEFENDANTS KHATER AND TANIOS

51.     On March 14, 2021, law enforcement officers arrested KHATER and TANIOS.  On KHATER's person was a Black iPhone 11 with a Black OtterBox Case with IMEI: 356543101844685, which was recovered and is currently located at the FBI Washington Field Office in Washington, D.C.  Pursuant to a search warrant, on March 14, 2021, law enforcement officers searched TANIOS's residence.  At TANIOS' residence, investigators found a black backpack identical to the one TANIOS used to carry chemical spray at the Capitol, as seen in the surveillance footage. Investigators also recovered a Sig Sauer 9millimeter handgun with TANIOS' wallet and driver's license from the same backpack.  Additionally, investigators recovered two canisters of Frontiersman brand bear spray, one canister with a safety device intact and one canister with a missing safety device.  Investigators also recovered a smaller canister of chemical spray. The Frontiersman canisters are consistent in color, shape and to the canister that KHATER is seen holding at the Capitol. Additionally, an iPhone 11 with a black Liquipel case with IMEI: 356115091860888 was  recovered from TANIOS' residence in the upstairs primary bathroom on the vanity.  The Device is currently located at the FBI Washington Field Office, Washington, D.C.

52.     On March 15, 2021, law enforcement officers searched KHATER's residence pursuant to a search warrant. During the search of KHATER's residence, investigators recovered a hat, gloves, and a Columbia jacket matching those KHATER is seen wearing on the video footage from January 6, 2021. In a pocket of a separate green jacket that was found underneath the Columbia jacket, investigators recovered a spent canister of chemical spray. This canister appears to be identical to the canister recovered from TANIOS' residence.

53.     Additionally, following his arrest, KHATER spoke to investigators and admitted

that he drove from New Jersey to pick up TANIOS in West Virginia, and that the two drove together to Washington, D.C., the night before the January 6 riot. KHATER told investigators that the two defendants shared a backpack, which TANIOS carried that day, containing the chemical spray that TANIOS had purchased. KHATER also identified himself and TANIOS in photographs and video taken from the incident. KHATER stated that after the spraying incident, KHATER and TANIOS stayed at the Capitol grounds and that he KHATER climbed the scaffolding to take pictures.

54.     The TANIOS Device came into the FBI possession based on a search warrant approved on March 14, 2021, by Magistrate Michael Aloi, United States District Court for the District of West Virginia, which was executed that day at TANIOS' residence,  205 Blue Ridge Lane, Morgantown, WV 26508. Based on Magistrate Aloi's Order, the FBI might already have all necessary authority to examine the Device, however, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

## TECHNICAL TERMS

55.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage

facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio

signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

       c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

       d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or

locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

   e. "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

   f. "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

   g. Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers,

each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.      When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

34

o.      "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and

other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

56.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.apple.com, I know that the KHATER and TANIOS Devices, which are both Apple iPhones, each have capabilities to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

57.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the KHATER and TANIOS Devices, in whatever form they are found. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the KHATER and TANIOS Devices, for at least the following reasons:

a.     Individuals who engage in criminal activity, including the TARGET OFFENSES, use digital devices, like the KHATER AND TANIOS Devices, to access websites, to facilitate illegal activity, and to communicate with co-conspirators online; to store on digital

devices, like the KHATER and TANIOS Devices, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; and, as referenced above, use digital devices to communicate with co-conspirators before, during, and after the commission of the TARGET OFFENSES, as well as to record images of the TARGET OFFENSES being committed.

        b.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

        c.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep

a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

58.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable

from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the KHATER and TANIOS Devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.       Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

39

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

59.      Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part

because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.

41

Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.

42

A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

        e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

        f.     Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined

search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

60.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.     The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.    In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## **AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

61.    Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

62.    I submit that this affidavit supports probable cause for a warrant to search the KHATER and TANIOS Devices described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____ _____

Riley Palmertree, Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on May 19, 2021

_____

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

45